[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, New England Health Affiliates, Inc. (NEH), seeks return of a $150,000 deposit made pursuant to a Purchase and Sale Agreement. The Agreement contemplated the plaintiff's purchasing three nursing homes owned by the defendants. Plaintiff also makes a CUTPA claim [C.G.S. 42-110a et seq.] and a treble damages claim pursuant to C.G.S. 52-564.
Plaintiff had three equal principals; Rolland Castleman, Howard Dickstein, and Josiah Lessner. It had other investors too.
The defendant Talar, Inc., is the managing corporation for the several nursing homes. The other corporate defendants own the nursing homes: i.e. Rockville Memorial Nursing Home, Inc. d/b/a Rockville Memorial Nursing Home, Rockville; Abbey Convalescent Home of Hartford, Inc. d/b/a Buckley Convalescent Home, Hartford; and Abbey Manor, Inc. d/b/a Abbey Manor, Willimantic. The defendants' principal operatives are the defendant Edward Talarski and his brother, Peter Talarski (not a defendant). The Talarski brothers manage and control the operations of the defendant, corporations [and own and/or control substantial amounts of the stock thereof]. The defendant Edward Talarski is the treasurer and principal executive running the operations of the corporate defendants.
The parties had been negotiating and attempting to sell and transfer the ownership and operation of the three convalescent homes for some time. Well before the Purchase and Sale Agreement CT Page 1612 which is the focus of this action, the parties had had another agreement for the sale of these convalescent homes. That agreement expired. The parties continued in their mutual interest in the sale and transfer.
On July 17, 1989, they entered into a new agreement. Purchase and Sale Agreement, July 17, 1989. Exhibit A.
The Agreement contained the following regarding the time for closing:
"ARTICLE III
"CLOSING
 "3.01 The Closing of title shall take place at the office of the Buyer, 113 East Center Street, Manchester, Connecticut within thirty (30) days following the completion of all conditions precedent to closing but in no event later than December 29, 1989, at 10:00 a.m., or such other place or time as the parties may agree upon in writing." Exhibit A, p. 5.
The base purchase price was $6,850,000.00.[1] The buyer also agreed to pay up to $2,100,000.00 (in addition to the base sale price) for "required repairs, alterations, or improvements" necessary for the license transfer. Purchase and Sale Agreement, Exhibit A, 8:02, pp. 10-11. The buyer was required to make a $150,000.00 deposit. The Purchase and Sale Agreement contained the following regarding the deposit:
 "2.03 The deposit referred to in subparagraph 2.01(a) shall be held by a representative of Sellers and a representative of Buyer as escrow agents under their joint control. Upon closing of the within transaction, the deposit shall be paid over to Sellers. In the event a closing does not take place for any reason other than a default of the Buyer then, in such event, the deposit shall be returned to the Buyer.
 "2.04 The escrow agents shall deposit said sum in an interest bearing account requiring both their signatures for withdrawal. Notwithstanding anything herein to the contrary, interest on said deposit shall belong to Sellers even in the event the closing hereinafter established shall not take occur and the buyer shall not be in default. CT Page 1613
 "2.05 The parties hereby appoint the following named as escrow agents:
For Sellers: Edward W. Talarski
For Buyer: Josiah J. Lessner"
Exhibit A, p. 5.
The deposit was made on the day the agreement was signed, i.e. July 17, 1989. Exhibit A, 2.01, p. 5.
The $150,000.00 deposit funds were placed in an escrow account (Savings Investment Certificate) with the Connecticut National Bank. The account was in the name of Talar, Inc. Complaint, First Count, 5, Answer, First Count, 4. Two signatures were required for withdrawal. The signatures were those of defendant Edward Talarski, and Josiah J. Lessner, one of the principals of the plaintiff. Purchase and Sale Agreement, 2.03 — 2.05; Exhibits A, B, and C.
During the times here in question, and for some time prior, the convalescent homes were losing money; the Talarskis were most anxious to sell them. The convalescent home business is regulated by government. The Talarskis could not raise the rates they charged; under the regulations their rates were tied to the history of their finances. On the other hand, a buyer would not be so hampered; the buyer could charge higher rates and presumably turn the operations profitable.
The regulatory authorities used the sale and transfer of a convalescent home as the occasion to upgrade such facilities. Upon a sale and transfer the facility would have to pass rigorous inspections and meet various criteria. The parties here knew that much work had to be done on the three homes in order to have the homes meet these regulatory requirements. Abbey Manor needed substantial work including an A-2 survey, redesign of the layout of the first floor rooms by an architect, zoning approval, and the actual improvement-renovation work. All three homes had to be inspected by the State Health Department. The reports of those inspections would define the work necessary for transfer of the licenses.
The parties knew that the buyer would need to get financing to CT Page 1614 be able to make the purchase. It was known that buyer intended to finance the purchase through a financing available through the United States Department of Housing and Urban Development (HUD) known as "FHA Section 232 Coinsurance Program." The Agreement specifically addressed the financing as follows:
 "7.01 The Buyer shall proceed to obtain mortgage financing under the FHA Section 232 coinsurance program, as proposed by Sims Mortgage Funding, Inc. by cover letter dated May 30, 1989, and to obtain a building engineering inspection under said coinsurance program. This agreement and the obligation of the Buyer to consummate the transaction called for under this Agreement is contingent upon the Buyer successfully fulfilling the normal requirements for such type of financing including the required equity financing and obtaining a satisfactory building engineering inspection. . . . .
 "7.02 Sellers represent and warrant that the Premises is free . . . asbestos . . . .
 "7.03 In the event that Buyer does not obtain said firm loan commitment within one hundred twenty (120) days from the date of this Agreement, the Buyer must give notice, within five (5) days of said loan denial notice, but in no event later than one hundred twenty (120) from the date of this Agreement, in writing, to the Sellers of the Buyer's inability to obtain said mortgage loan. In the event that said notice is not received by Sellers prior to 5:00 p. m. on said date, this Agreement shall remain in full force and effect as if this paragraph had not been included herein, and this Agreement shall close as agreed. If such notice is received prior to 5:00 p. m. on said date, this Agreement shall terminate and be of no further force and effect, and the Sellers and Buyer shall each be discharged of all liability to the other hereunder and all deposits being paid hereunder shall be refunded to the Buyer together with any interest earned thereon if Buyer is not otherwise in default of the terms of this Agreement." Exhibit A, pp. 9-10.
Upon signing the Agreement both parties worked diligently towards consummation of it. There was much to be done.
On October 20, the three-month Savings Investment Certificate that represented the $150,000 deposit matured and was allowed to "roll-over" for another three-month term. CT Page 1615
Things apparently did not go as quickly as the parties had hoped and anticipated.
On October 30, 1989, the principals met at the Steak Out Restaurant in Vernon. Castleman and Dickstein were there for the plaintiff. The Talarski brothers represented the defendants. Castleman reviewed the status of the project; the A-2 survey was not done, the architects-engineers' tasks were incomplete, the zoning application had not been filed, and the state inspection reports had not been completed. Due to these incomplete matters, the mortgage application could not even be filed. Castleman testified he stated there was no way the mortgage contingency deadline of November 14, 1989 could be met.
Castleman says he asked the Talarskis if they wanted to terminate. Castleman says the Talarskis responded that the plaintiffs were so far ahead of anyone else who might buy the nursing homes that abandoning this deal would be counter-productive. According to Castleman, he made it clear plaintiff needed additional time to prepare and file the "232" application, things were so fluid, he did not know when plaintiff could file the "232" application. Castleman testified he recommended that they not execute an amendment at that time, but rather wait until they could put together a realistic timetable and then execute an amendment. According to Castleman they discussed executing an amendment before November 14, but decided not to. According to Castleman the parties were working together toward the common goal of the Purchase and Sale Agreement. He also testified the parties agreed to proceed without then amending and amend later when the prerequisites for the "232" application were completed or it was known when they would be done. The Talarskis agreed to this. According to Castleman, the Talarskis specifically agreed that the November 14 mortgage contingency deadline was set aside to await the amendment setting new deadlines, etc.
Castleman testified that plaintiff authorized expenditures to advance the project as a result of the claimed accord reached at the October 30 meeting.
Dickstein, who attended the October 30 meeting, testified. He confirmed Castleman's account of the meeting. He specifically testified that the Talarskis had agreed to the postponement of the November 14 mortgage contingency deadline. CT Page 1616
Both Talarskis testified. They said the mortgage contingency deadline was not even discussed. They deny any agreement was made to postpone or abrogate it in any way.
After the October 30 meeting, the parties continued their efforts towards closing the sale and transfer.
November 14 was the 120th day after the July 17 Agreement was signed. It was the date by which the Buyer was to notify the Sellers that the mortgage financing could not be obtained.
Both Talarskis usually, if not always, left their office on weekdays well before 5:00 o'clock to avoid the evening rush hour traffic. However, on November 14, they were apprehensive that a letter notice called for in 7:03 of the Purchase and Sale Agreement would come from the plaintiff dashing their hopes for the sale. When the usual time for them to leave to go home came, they decided to stay until 5:00; the deadline for the cancellation notice. When it did not arrive by 5:00, they were happy and confident the plaintiff had committed to the long awaited sale of the nursing homes.
The parties continued to work towards closing and regularly communicated to that end. Apparently the mortgage financing was not discussed or the fact that the financing notice deadline had come and gone.
By December 15, things had progressed significantly. The A-2 survey was done. A plan for Abbey Manor was in hand, although it was not entirely correct. A redesign acceptable to both parties was agreed upon. The zoning application would be filed by December 30.
The parties met on December 15. They reviewed the progress to date; the elements were coming together. It was agreed the closing date deadline could be set at April 30, 1990. Castleman immediately prepared an amendment which the plaintiff executed on that date. The defendants executed the amendment on December 19. It provided that ". . . the parties hereto hereby amend the Purchase and Sale Agreement, dated July 17, 1979, . . . with respect to following paragraph only:
"CLOSING
"3.01 The Closing of title shall take place at the CT Page 1617 office of the Buyer, 113 East Center Street, Manchester, Connecticut within thirty (30) days following the completion of all conditions precedent to closing but in no event later than April 30, 1990, at 10:00 a.m., or such other place or time as the parties may agree upon in writing." Exhibit D.
On January 17, 1990, Secretary Jack Kemp of the United States Department of Housing and Urban Development announced that the Section 232 Coinsurance Program was being terminated or suspended. Castleman, Castleman, Dickstein were taken aback by this development. Section 232 coinsurance financing had been the backbone of their plan. Castleman immediately notified Edward Talarski of the HUD action. Castleman and plaintiff's broker explored other ways to finance the project.
On or about January 20, 1990 the Savings Investment Certificate matured and "rolled over" again for another three months. The Talarskis believed that they were entitled to the deposit, and had been since the November 14, 1989 mortgage contingency deadline had passed. The Talarskis made no attempt to get the funds for the defendants' own use or voiced any claim the funds were now the defendants alone.
Plaintiff considered various financing alternatives. Plaintiff's principals were still confident they could arrange the financing required to complete the transaction.
On February 6, 1990, the parties met. Castleman, Dickstein, and Lessner attended for the plaintiff. The Talarski brothers did. David Horowitz and Thomas Danielle, the accountant for the nursing homes attended. Alternative financing was discussed. Seller financing was discussed, In that vein, there was some idea of releasing the deposit to the defendants. See Exhibit E. Castleman and Dickstein testified they were very concerned about the status of the deposit. They testified they were assured by the Talarskis the deposit funds were still at the bank. The parties were still working together to close the sale.
The plaintiff continued to seek financing. The parties were in frequent contact endeavoring to accomplish the various things that had to be completed to close the sale.
After the February 6, 1990, Castleman and Edward Talarski had several telephone conversations. The financing plaintiff was pursuing was discussed. One prospective source of financing was CT Page 1618 the Juniper Partnership. But the Juniper Partnership had to get funds from its banks. Juniper therefore required there be an agreement for the sale and purchase. Castleman says he told Edward Talarski he had to be sure there was still a viable agreement. Castleman says he again told Talarski that plaintiff could use the $150,000 and that the Talarskis could use the interest. If there was no deal they should terminate without further delay. Talarski never stated or intimated that the deposit funds were no longer subject to any claim of the plaintiff.
In early April 1990, Edward Talarski received notice that the deposit certificate would mature on April 20. A bank official called him and asked him what should be done with the funds at maturity. Without consulting with his co-escrow agent, Lessner, Talarski told the banker to put the funds into Talar's regular account. This was done. He may have told the banker that these funds were to be used for the defendant corporations' regular bills. See Exhibit F. Edward Talarski testified he intended to use the $150,000 for a pension fund contribution which had to be made by June 15, 1990. He also says he told Talar's bookkeeper not to use the funds. Again according to Edward Talarski, unbeknownst to him, the funds were used for ordinary corporate expenses.
On May 7, 1990, another extension amendment was executed, It was identical to the December 1989 amendment, only the closing date in Article III was changed to June 15, 1990. Exhibit G.
It developed that the Juniper Partnership financing would be conventional financing. The "numbers" for the nursing homes were such that only $5,000,000 could be realized from that source of financing. This was not enough for the Juniper Partnership and/or plaintiff to be able to purchase the homes as provided in the Purchase and Sale Agreement.
The parties met on June 15, 1990. Castleman informed "it was time to call it quits." He offered defendants the work product plaintiff had developed in their efforts to close the deal. Again according to Castleman, he said that he told Talarski that plaintiff could use the $150,000 and that the defendant corporations could use the interest. He told Talarski to work out the deposit return details with Lessner. The Talarskis did not respond to this. Neither Talarski voiced disagreement. Neither Talarski made the claim that the deposit belonged to the defendants alone. The Talarskis did not tell the plaintiff's people that the deposit money had been withdrawn from the escrow account and used CT Page 1619 by the defendants for their own purposes.
Castleman tried to contact Edward Murphy, defendants' attorney, to work out a termination agreement. When Castleman and Murphy spoke on June 26, something Murphy said led Castleman to question the status of the deposit. Murphy then, or shortly thereafter, informed that the Talarskis took the position that the plaintiff was not entitled to the return of the deposit and that defendants had no intention of releasing it to plaintiff. Prior to that conversation with Murphy, there had never been even the slightest indication by defendants that the deposit had become defendants alone.
Plaintiff expended thousands of dollars after October 30, 1989 in furtherance of the closing. Castleman testified these funds would not have been spent if defendants had not agreed on October 30, 1989 to an extension of the November 14, 1989 mortgage contingency deadline.
The court must determine whether the parties, before or as of November 14, 1989, had agreed to abrogate the November 14, 1989 mortgage contingency deadline. The focus must be on what occurred on or before November 14. What occurred after November 14 is significant only insofar as it illuminates what occurred before November 14.
Plaintiff contends the defendants agreed to waive the November 14, 1989 mortgage contingency deadline at the October 30, 1989 meeting. Castleman and Dickstein testified the waiver agreement was made. The two Talarskis testified no waiver agreement was made.
Up until January 17, 1990, on October 30, and in November 1989, Castleman and Dickstein were confident that plaintiff could get Section 232 coinsurance financing. Both testified of their confidence. Castleman testified that cancellation of the Section 232 program was the farthest thing from his mind. Plaintiffs' principals were confident the plaintiff would qualify and get Section 232 financing when the other conditions precedent to closing were accomplished.
Section 7:03 of the Purchase and Sale Agreement provided plaintiff with an election.[2] Plaintiff could terminate the agreement if there was an "inability to obtain said mortgage loan." If plaintiff elected to terminate, plaintiff was obligated to give CT Page 1620 notice of its "inability." However, plaintiff could elect to proceed with the agreement even though plaintiff had not yet obtained a commitment for the designated financing.
 "In the event that said notice is not received by Sellers prior to 5:00 p. m. on said date, this Agreement shall remain in full force and effect as if this paragraph had not been included herein, and this Agreement shall close as agreed." Purchase and Sale Agreement, 7:03. Exhibit A.
Under the Purchase and Sale Agreement, plaintiff-buyer, by not giving the notice by 5:00 p. m. on November 14, 1989, elected to proceed with the transaction even though the mortgage commitment had not been obtained.
The mortgage contingency provided in Article VII was not included in "the completion of all conditions precedent to closing" provision of Article III, 3:01, of the original Purchase and Sale Agreement. To hold otherwise would render 7:03 meaningless. That is not a reasonable or permissible construction of 7:03. Section 7:03 is clearly independent of 3:01's "completion of all conditions precedent to closing." If the parties had not made any agreements after July 17, 1989, and buyer had not given the notice called for in 7:03, buyer, on December 29, 1989, could not have claimed successfully or legitimately that its failure to obtain a Section 232 commitment relieved it (buyer) of its obligation to close. The court holds that the provisions of Article VII are not included in the "completion of all conditions precedent to closing" language of Article VII, 7:03.
The "completion of all conditions precedent to closing" language of Article VII, 7:03, has the same meaning in the two amendments as it has in the original Purchase and Sale Agreement.
Neither Castleman or any one else ever memorialized by any writing the alleged agreement made on October 30, 1989 to postpone the November 14 mortgage contingency deadline. Castleman testified the December 1989 amendment contains the parties written acknowledgment that the mortgage contingency deadline was no longer in effect. Castleman testified the December 1989 amendment contains defendants' waiver of the Article VII mortgage contingency deadline. Castleman and plaintiff claim the "the completion of all conditions precedent to closing" provision in the amendments of December 1989 and 1990 (Exhibits D and G) incorporate the alleged waiver. According to Castleman, it was always recognized and CT Page 1621 understood that Section 232 coinsurance mortgage financing was a condition precedent to closing and therefore the mortgage contingency was also included in the "the completion of all conditions precedent to closing" provision of 3:01 of the original Purchase and Sale Agreement and the two amendments thereto.
The court cannot accept this contention. It was plaintiff's prerogative under the Purchase and Sale Agreement (which Castleman had drafted) to go forward with the transaction in the absence of the HUD FHA 232 Coinsurance financing. If plaintiff elected (chose) not to proceed with the agreement, it had to give the notice of the inability to get the Section 232 financing by November 14, 1989. On the other hand, plaintiff could elect to proceed without the financing commitment and not give the notice. Plaintiff's principal actors here were not neophytes; in fact they were quite sophisticated on these matters. Castleman and Lessner were experienced "business" lawyers, and as such, familiar with the parol evidence rule and the pitfalls of relying on oral amendments to written agreements. It is hard to accept the idea that they believed the December 1990 and March 1990 amendments incorporated the claimed waiver agreement made on October 30, 1989. The plaintiff has not satisfied its burden of proof establishing the claimed agreements made on October 30, 1989.
Plaintiff seemingly claims that the "roll over" of the deposit funds on October 20 and which thus had the funds tied up and beyond defendants' control for a period well beyond the November 14 mortgage contingency deadline somehow shows that the November 14 date had been waived by defendants. Plaintiff argues:
 "The funds on deposit, which were placed in a 90 day certificate of deposit, were rolled over after the first 90 days, despite the fact that the 120 day period allotted for the financing contingency would expire before the certificate of deposit again would expire mature." Trial Brief, March 11, 1992, p. 2.
The court cannot find or infer anything helpful to the plaintiff's position based on this. The first "roll over" on October 20, was three weeks before the November 14 mortgage contingency deadline. No one, and least of all the defendants, could know whether the plaintiff would elect to go forward with the transaction without that financing.[3] Furthermore, the Purchase and Sale Agreement does not provide that the defendants were immediately entitled to the deposit upon the plaintiff's evidencing CT Page 1622 its election to proceed by not giving the notice called for in 7:03 by November 14, 1989.
Later "roll overs" which occurred after November 14, 1989, when the plaintiff had not given the notice required by 7:03 to terminate are perhaps problematic. Edward Talarski testified that he intended to use the $150,000 for a pension fund contribution which had to be paid by June 15, 1990. But how defendants treated or looked on the deposit funds after plaintiff did not give the notice required by 7:03 does not enhance plaintiff's position.
Plaintiff contends the Talarskis mislead plaintiff by not telling plaintiff the deposit was now essentially defendants. Defendants were not under any obligation to inform plaintiff of their beliefs.
When November 14, 1989 passed and the plaintiff had not given the noticed required by 7:03, defendants had every reason to assume that the plaintiff had elected to proceed with the closing even though plaintiff had not obtained Section 232 financing. Defendants legitimately believed the plaintiff had elected to go forward with the Purchase and Sale Agreement and that plaintiff knew it had relinquished any claim to the deposit unless the defendant-sellers were to default.
Plaintiff also claims that the Talarskis misrepresented that the deposit funds were still on the deposit at the bank. Any such claims of misrepresentation made before April 20, 1989 are unfounded. In fact, the deposit was still in the escrow account at the bank until April 20, 1990.
There is no evidence of any representation-misrepresentation occurring during the period between April 20 and June 15, 1989. However, on June 15, 1990, Edward Talarski probably misrepresented the status of the deposit by his silence.[4] However, plaintiff was not harmed by this; plaintiff was then in default and defendants were entitled to the deposit pursuant to the liquidated damage clause of the Purchase and Sale Agreement. Exhibit A, Article XVI, pp. 28-9.
Plaintiff's main contentions are that the defendants waived the provisions of 7:03 and/or are estopped from asserting or relying on same. See Plaintiff's Trial Brief, March 11, 1992, pp. 4-9. These contentions fail in view of the court's finding that plaintiff has not established the fact of the claimed April 30, CT Page 1623 1989 agreement.
Plaintiff's CUTPA and C.G.S. 52-564 treble damage claim are largely predicated on the claimed October 30, 1989 agreement. They must fail too.
The CUTPA claim is also invalid because the defendants were not in the "trade or business" of selling nursing homes. Further, the defendants obtaining and using the deposit funds on and after April 20, 1990, given the probability of defendants' eventual entitlement to these funds probably would not be conduct violating CUTPA. It did not cause substantial injury, or any injury, to anyone.
Likewise, the court holds that under the circumstances, Talarski's breach of the escrow agreements does not constitute a stealing of plaintiff's property. The deposit funds did not belong to plaintiff alone. And, it was probable on April 20, 1990 the defendants eventually would be entitled to these funds. That is what has occurred.
Edward Talarski's unilateral appropriation of the deposit funds despite the two-signature requirement of the escrow arrangements cannot be, and is not, condoned. However, his violation of the escrow agreement(s) did no harm to the plaintiff. Plaintiff did not know of the unilateral appropriation until at least June 26, 1992. As of that time, plaintiff was in default and the defendants were entitled to the deposit funds. Plaintiff suffered no loss by virtue of Talarski's breach of the escrow agreement(s).
In view of the foregoing, judgment should enter in favor of the defendants.
It is so ordered.
Parker, J.